# District of Columbia
# Court of Appeals

**No. 14-CV-659**



FILED

FEB **11** 2016

DISTRICT OF COLUMBIA
COURT OF APPEALS

CARLYLE INVESTMENT MANAGEMENT, LLC, *et al.*,
                                                                 Appellants,

v.                                                                                        **CAB-3190-13**


ACE AMERICAN INSURANCE COMPANY, *et al.*,
                                                                 Appellees.


On Appeal from the Superior Court of the District of Columbia
Civil Division


BEFORE:   Thompson and Easterly, Associate Judges; and Reid, Senior Judge.

## J U D G M E N T

This case came to be heard on the transcript of record, the briefs filed, and was argued by counsel.   On consideration whereof, and as set forth in the opinion filed this date, it is now hereby

ORDERED and ADJUDGED that the trial court's order of dismissal is vacated, and the case is remanded to the trial court for discovery, and for dispositive motions or trial.

For the Court:

JULIO A. CASTILLO
Clerk of the Court

Dated:   February 11, 2016.

Opinion by Senior Judge Inez Smith Reid.

*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

**DISTRICT OF COLUMBIA COURT OF APPEALS**

FILED 2/11/16
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

No. 14-CV-659

CARLYLE INVESTMENT MANAGEMENT L.L.C., *et al.*, APPELLANTS,

v.

ACE AMERICAN INSURANCE COMPANY, *et al.*, APPELLEES.

Appeal from the Superior Court
of the District of Columbia
(CAB-3190-13)

(Hon. Frederick H. Weisberg, Trial Judge)

(Argued May 12, 2015                    Decided February 11, 2016)

*Stephen A. Weisbrod*, with whom *Martin Bienstock*, *Andrew W. Lamb*, and *Sean J. Williams*, were on the brief, for appellants.

*Louis H. Kozloff*, with whom *Lawrence H. Mirel*, *Luke D. Lynch, Jr.*, and *David Kuffler*, were on the brief, for appellees.

Before THOMPSON and EASTERLY, *Associate Judges*, and REID, *Senior Judge*.

REID, *Senior Judge*: This case involves efforts by appellants, Carlyle Investment Management ("CIM"), TC Group, L.L.C. ("TCG"), and TCG Holdings, L.L.C. ("TCGH") (collectively, "appellants"), to obtain declaratory relief indicating that they are entitled to insurance coverage for defense costs incurred or to be incurred in underlying lawsuits. The trial court granted the Super. Ct. Civ. R. 12

(b)(6) motion of appellees, Ace American Insurance Company and fifteen other insurance companies, including Chartis Property Casualty Company and Chartis Specialty Insurance Company ("the insurance companies"), and dismissed appellants' complaint.  The trial court concluded that, as a matter of law, all of the claims in the underlying lawsuits arise from "professional services" provided to the Carlyle Capital Corporation ("CCC"), and hence, the claims fall under the insurance policies' "Carlyle Capital Corp Exclusion" ("the professional services exclusion" or "the CCC exclusion").  For the reasons stated below, we vacate the trial court's order of dismissal and remand the case to the trial court for discovery, and for dispositive motions or trial.

## FACTUAL SUMMARY

According to appellants' complaint, The Carlyle Group formed CCC as an independent company under the laws of the Island of Guernsey, Channel Islands, in 2006.[1]  CCC is governed by a small Board of Directors, and is managed by CIM

---

[1]  CCC has described The Carlyle Group as "a private global investment firm" that, among other activities, "originates, structures and acts as lead equity investor in management-led buyouts . . . [and in] equity private placements . . . ." Appellants' complaint also characterizes (1) The Carlyle Group as "a global private

(continued…)

and its affiliates—TCG and TCGH.[2]

"CCC invested primarily in AAA-rated residential mortgage-backed securities issued by Fannie Mae and Freddie Mac." Initially Class A shares in CCC were issued to beneficial voting shareholders. In September 2006, CCC prepared a private placement memorandum governing the private placement of non-voting shares. In late 2006 and in part of 2007, CCC offered its Class B shares to qualified investors and raised $945 million. Among the investors in CCC were Michael Huffington, and the National Industries Holding Group ("NIG") of Kuwait. After CCC collapsed in 2008, due to "the confluence of the mortgage and liquidity crises," several legal actions were filed against The Carlyle Group, CCC, CCC Directors, CIM, TCG, TCGH, and David Rubenstein (co-founder of The Carlyle Group); plaintiffs in these actions included Mr. Huffington (2011 complaint), NIG (2009 complaint), the CCC liquidators (2012 complaint), and various shareholders (2011 complaint). As the legal actions unfolded in various courts, CIM, TCG and TCGH gave the insurers notice of the lawsuits and made claims against the insurance

_____

(…continued)
equity firm comprised of numerous companies, including CIM, TCG and TCGH"; (2) CIM as "a subsidiary of TCG"; and (3) TCG as "a subsidiary of TCGH."

[2] CCC and CIM (but not TCG and TCGH) executed an Investment Management Agreement on September 20, 2006.

companies for the advancement and reimbursement of defense costs. The insurers have denied the claims.

After the formation of CCC, The Carlyle Group had arranged for expanded insurance coverage through a $15 million policy issued to TCG by American International Specialty Lines Insurance in 2006/2007, and a $10 million policy issued to TCG by the same company in 2007/2008 and 2008/2009. In 2009/2010, Chartis Specialty Insurance Company (the new name for the former insurance company) issued a $10 million private equity management and professional liability policy to TCG; this policy was known as the TCG Program. Other insurers issued excess policies to TCG, beginning with $50 million excess coverage for the year 2006/2007, $75 million in 2007/2008, $100 million in 2008/2009, and $145 million in 2009/2010. In addition, The Carlyle Group and CCC purchased another policy for CCC through Chartis Europe Limited; this policy was known as the CCC Program and covered CCC Directors and CIM only for professional liability claims.

In 2007 (and continuing through the 2009/2010 insurance coverage period), American International Specialty Lines, Chartis Specialty Insurance, and the excess insurers added Endorsement #2, the "Carlyle Capital Corp Exclusion," to the TCG policy. This professional services exclusion specified that, "In consideration of the

premium charged, it is hereby understood and agreed that the Insurer shall not be liable to make any payment for Loss in connection with any Professional Services Claim arising from Professional Services provided to Carlyle Capital Corp."[3]

---

[3] The 2009/2010 policy defined "professional services claim" as "a [c]laim made against any [i]nsured arising out of, based upon or attributable to [p]rofessional [s]ervices provided by an [i]nsured." The policy defined professional services as:

> (1) [T]he giving of financial, economic or investment advice regarding investments in any debt, equity or convertible securities, collateralized debt obligations, collateralized loan obligations, collateralized mortgage obligations, . . . , including without limitation the giving of financial advice to or on behalf of any [f]und (or any prospective [f]und) or any separately managed account or separate account holder or any limited partner of any [f]und (or prospective [f]und) or any other investor or client of, in or with an [o]rganization;

> (2) [T]he rendering of or failure to render investment management services, including without limitation investment management services concerning any of the foregoing investments, and including without limitation, the rendering of or failure to render investment management services to or on behalf of any [f]und (or any prospective [f]und) or any separately managed account or separate account holder or any limited partner of any [f]und (or prospective [f]und) or the rendering or failure to render investment management services to or on behalf of any other investor or client of, in or with an [o]rganization;

(continued…)

Appellants' complaint for declaratory relief and damages, filed in the Superior Court of the District of Columbia on May 7, 2013, alleged two causes of

---

(…continued)

   (3) [T]he organization or formation of, the purchase or sale or offer or solicitation for the purchase or sale of any interest(s) in, the calling of committed capital to, a [f]und or prospective [f]und;

   (4) [A]ny activity relating to the offer, purchase or sale or solicitation for the purchase or sale, or disposition or divestiture of any [p]ortfolio [e]ntity (or prospective [p]ortfolio entity) or any interest(s) in a [p]ortfolio [e]ntity (or prospective [p]ortfolio [e]ntity);

   (5) [T]he providing of advisory, consulting, management, monitoring, administrative, investment, financial or legal advice or other services for, or the rendering of any advice to, or with respect to, an [o]rganization, a [f]und (or any of its limited partners or members) or a [p]ortfolio [e]ntity (or a prospective [o]rganization, [i]nvestment [f]und or [p]ortfolio [e]ntity)

   (6) The solicitation, offer, syndication, promotion or calling of capital by an [i]nsured for any manner of co-investment in a [p]ortfolio [e]ntity or [p]rospective [p]ortfolio [e]ntity, including but not limited to fund-raising, road show, investor relations or pre-IPO activities;

   (7) [T]he payment or non-payment of any distribution, dividends, redemption (whether in cash or in-kind) by any [i]nsured], [p]ortfolio [e]ntity or any of their respective parents, subsidiaries or affiliates; or

   (8)  Other similar or related services.

action. Count one sought a declaratory judgment concerning its policies, and, as relief, appellants requested, in part, "a judgment declaring that Carlyle has satisfied the terms and conditions of the policies," as well as:

> a judgment declaring Carlyle's rights to coverage under the policies in the TCG Program for CCC-related claims, including Carlyle's rights to advancement of defense costs, Carlyle's rights to reimbursement of indemnification payments made to or on behalf of the CCC Directors and Mr. Rubenstein, and Carlyle's rights with respect to payments of judgments or settlements.

Count two alleged breach of contract and requested damages.

In response to the complaint, appellees filed a joint motion to dismiss on July 19, 2013, pursuant to Super. Ct. Civ. R. 12 (b)(6). Appellants lodged an opposition to the motion on September 20, 2013; appellees filed a reply and appellants a surreply. The parties also filed exhibits in support of the motion and opposition. In addition, on March 19, 2014, appellees moved to stay discovery pending a decision on their motion to dismiss. Appellants opposed the motion on April 17, 2014, and the parties filed additional pleadings pertaining to the motion to stay discovery. On April 29, 2014, the trial court granted the motion to stay discovery, asserting that despite the passage of time since the filing of the motion to dismiss, "it would be inefficient, and potentially unfair to [Appellees], to launch the parties into

expensive discovery while the court considers whether [Appellants] have a basis to go forward with their complaint."

Subsequently, on May 15, 2014, the trial court signed an order granting appellees' motion to dismiss. In essence, the trial court concluded that key terms are so broadly defined in the insurance contract that everything alleged in the various underlying complaints (Huffington, NIG, etc.), for which appellants sought defense costs, is excluded from coverage. Specifically, the court declared that the terms "Professional Services" and "Professional Services Claim" "are specifically defined in the contract, the definitions are broad and unambiguous and, as used in the Exclusion, they operate to exclude coverage for all of the losses (and defense costs) at issue in this case." The court asserted:

> Although plead in a plethora of different legal theories and multiple counts, the gravamen of all of the underlying complaints is that [appellants] enticed the investors into unsafe investments by falsely promising high returns with minimal risk, misled or failed to warn investors about increasing risk, and mismanaged the investments by failing to guard against their inherent risk, even after deteriorating market conditions should have dictated a variety of conservative strategies designed to decrease leverage and prevent the insolvency of the company and investor losses that occurred in 2008.

The court acknowledged that appellants correctly contended:

> that the court is required to consider each claim in each

complaint in deciding the coverage issue presented, but the 'eight corners rule' neither requires nor permits the court to scrutinize each count in each complaint with a dictionary in one hand and The Chicago Manual of Style in the other to see if there is an allegation that could be contorted so as to bear an interpretation that would take it out of the Exclusion[;] [t]he exclusion is not ambiguous.[4]

The trial court rejected appellants' argument that "'management-liability claims'—those related to acts, errors, and omissions in corporate governance or 'D&O' claims—are not excluded."  As the court put it:

> Whatever might be true in the insurance industry generally, in [the] insurance contract [at issue], "Loss in connection with any Professional Services Claim arising from Professional Services provided to Carlyle Capital

---

4   The trial court concluded:

> Each claim in each complaint arises from the provision of Professional Services to CCC, whether it relates to the alleged false marketing of the shares to private investors (Huffington and NIG), the alleged failure to make required disclosures to purchasers of publicly traded shares (Shareholder Class Action), CIM's alleged mismanagement of CCC under the IMA (Huffington, NIG, Shareholder Class, and Liquidators), the alleged misrepresentations or failure to warn investors and failure to take appropriate actions to maintain adequate liquidity when the market was showing signs of collapse and CCC was over-leveraged (same), or the operation of CCC with divided loyalties by acting as "*de facto* directors" or "shadow directors," allegedly for the benefit of other Carlyle interests and to the detriment of CCC and its outside shareholders (Liquidators).

Corp." was expressly excluded from coverage[;] [t]hose terms were defined in the contract broadly enough to include virtually all of the conduct alleged against [appellants] (and those they are indemnifying) in the underlying lawsuits, whether or not such conduct would be characterized as professional services or corporate management in the industry generally or in some other insurance contract.

## THE PARTIES' ARGUMENTS

Appellants contend that the trial court erred by granting appellees' motion to dismiss, pursuant to Super. Ct. Civ. R. 12 (b)(6). They essentially argue that the trial court erred by construing the professional services exclusion "broadly" and "expansively" rather than "narrowly." They assert that the court further erred by failing to recognize that the professional services exclusion of the insurance contract is "'reasonably or fairly susceptible to different constructions or interpretations,' at least one of which allows some coverage," and that the professional services exclusion "is reasonably construed not to apply to the many [u]nderlying [c]laims concerning CCC's corporate governance; conduct occurring after CCC was publicly traded; or statements allegedly made to induce investors to hold onto interests in CCC, which plainly are not 'solicitation[s] for the purchase or sale of any interest[s].'" They also argue that the professional services exclusion is not reasonably construed to apply to *de facto* and shadow director claims in the

liquidators' law suit; and that the trial court wrongly branded as "irrelevant" the professional services definition's "recipient-entity requirements" (that is, for example, the requirement in some of the subparts of the definition that the services be rendered to a "Fund," "Organization," or "Portfolio Entity)." They fault the trial court for failing to "specif[y] what part of the "[p]rofessional [s]ervices" definition purportedly applies unambiguously to corporate governance," and for failing to "consider[] whether the definition of '[p]rofessional [s]ervices' is ambiguous due to its use of *undefined* phrases such as 'investment management services' and 'management services'" (emphasis in original).

Appellants contend that "[r]eversal is warranted here, [because] the terms 'investment management services' and 'management . . . services' do not unambiguously encompass corporate governance," that "corporate governance is not a 'service,'" and interpreting those services "as not encompassing corporate governance comports with common usage in the business world." Appellants further contend that "[n]o other part of the [p]rofessional [s]ervices definition comes close to encompassing corporate governance."[5] Finally, appellants emphasize that

_____

[5] Appellants further claim that their policy interpretation is "reasonable" under principles of contract interpretation, and "fits the objective context in which the parties agreed to the [p]olicy and [e]xclusion," a context that recognizes

(continued…)

the trial court must "analyz[e] each *cause of action* in each [underlying] lawsuit" (emphasis in original). And, they insist that, here, the trial court failed to apply the correct standard in dismissing its complaint under Rule 12 (b)(6) – the "defense-cost standard" that "precludes dismissal unless beyond doubt there is no possibility for any coverage for any [u]nderlying [c]laim."

Appellees urge this court to "hold as a matter of law that there is no coverage for the [u]nderlying [l]awsuits and affirm the Superior Court's dismissal of the [c]omplaint." Appellees stress the plain words of the professional services exclusion and the presence of the term "arising out of" in the professional services claim definition. Specifically, they contend that, "The breadth of the definition . . . assures Carlyle broad coverage for the range of activities it undertakes as part of its private equity operations," but "it bars coverage for [c]laims 'arising from' the provision of those same services to CCC." They further maintain that, "[b]ecause the CCC Exclusion excludes "'[p]rofessional services claims *arising from* [p]rofessional [s]ervices provided to Carlyle Capital Corp.' [emphasis in original],

---

(…continued)
"industry custom and usage," as well as "the simultaneous underwriting of the TCG and CCC Programs" and "the CIM-CCC relationship." They maintain that the trial court erred by failing (in the absence of the benefit of discovery) to understand that the professional services exclusion was an "E&O" (errors and omissions) exclusion and not a "D&O" (directors and officers) exclusion.

the [c]ourt need not determine that literally every allegation in the [u]nderlying [l]awsuits alleges an [i]nsured's provision of [p]rofessional [s]ervices to CCC." They insist that each underlying claim arises from professional services provided to CCC.

Appellees "push back" against appellants' arguments by stressing the broad definition of professional services, which they claim is unambiguous. They declare that, "the breadth of the definition of [p]rofessional [s]ervices" simply bolsters the Superior Court's conclusion that whatever phrases like 'management services' and 'professional services' might mean in the abstract and out of context, as used in the [p]olicy, they easily encompass both 'operational management' and 'corporate governance' services." Moreover, appellees agree with the trial court that whether CCC, "at any given point in time, was a [f]und, [o]rganization or some other form of entity relevant to the [p]olicy's definition of [p]rofessional [s]ervices," is irrelevant, because "the CCC Exclusion explicitly provides that it applies to all [p]rofessional [s]ervices 'provided to CCC.'"

## ANALYSIS

### Standard of Review

"We review *de novo* the trial court's dismissal of a complaint under Super. Ct. Civ. R. 12 (b)(6)." *Logan v. LaSalle Bank Nat'l Ass'n*, 80 A.3d 1014, 1019 (D.C. 2013) (citation omitted). In this notice pleading jurisdiction, which has "adopted the pleading standard[s] articulated by the Supreme Court," *Equal Rights Ctr. v. Properties Int'l*, 110 A.3d 599, 602 (D.C. 2015) (per curiam), a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Logan*, *supra*, 80 A.3d at 1019 (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)) (internal quotation marks omitted); *see also Comer v. Wells Fargo Bank*, 108 A.3d 364, 371 (D.C. 2015) ("to survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.") (internal quotation marks and citation omitted). "Bare allegations of wrongdoing that are no more than conclusions are not entitled to the assumption of truth, and are insufficient to sustain a complaint." *Logan*, *supra*, 80 A.3d at 1019 (citing *Iqbal*, *supra*, 556 U.S. at 679). "However, [w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* (internal quotation marks and citation omitted). We draw all inferences from the factual allegations of the complaint in the plaintiff's favor. *Equal Rights Center*, *supra*, 110 A.3d at 603 (citing *Grayson v. AT&T Corporation*, 15 A.3d 219, 288 (D.C. 2011) (en banc)). "A complaint should not be dismissed because a court does

not believe that a plaintiff will prevail on [its] claim[;] [i]ndeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test." *Logan*, *supra*, 803 A.3d at 1019 (citing *Grayson*, *supra*, 15 A.3d at 229 (internal quotation marks omitted)). "Dismissal is proper only where it appears, beyond doubt, that the plaintiff can prove no facts which would support the claim." *Schiff v. American Ass'n of Retired Persons*, 697 A.2d 1193, 1196 (D.C. 1997) (citations omitted).

**Discussion**

In this "private equity management and professional liability insurance" contract case, that the trial court dismissed under Rule 12 (b)(6) and that involves a demand for a declaratory judgment indicating that appellants are entitled to coverage for defense costs and for settlements and judgments, we are unable to agree with the trial court and appellees that appellants did not state a claim to relief that is plausible on its face because, as a matter of law, the policy's professional services exclusion is so broad and unambiguous that it precludes any coverage pertaining to appellants' defense of underlying lawsuits filed against them by Mr. Huffington, NIG, the CCC liquidators, and shareholders. Before explaining our conclusion, we set forth legal principles governing insurance contract interpretation.

***Legal Principles Governing Interpretation of the Insurance Policies***

Contract principles are applicable to the interpretation of an insurance policy. *Stevens v. United Gen. Title Ins. Co.*, 801 A.2d 61, 66 (D.C. 2002) (citation omitted). "The proper interpretation of a contract, including whether a contract is ambiguous, is a legal question, which this court reviews *de novo.*" *Tillery v. District of Columbia Contract Appeals Bd.*, 912 A.2d 1169, 1176 (D.C. 2006) (citation omitted). This court "adheres to an objective law of contracts, meaning that the written language embodying the terms of an agreement will govern the rights and liabilities of the parties regardless of the intent of the parties at the time they entered the contract, unless the written language is not susceptible of a clear and definite meaning." *Aziken v. District of Columbia*, 70 A.3d 213, 218-19 (D.C. 2013) (quotation marks and citation omitted). "The writing must be interpreted as a whole, giving a reasonable, lawful, and effective meaning to all its terms, and ascertaining the meaning in light of all the circumstances surrounding the parties at the time the contract was made." *Debnam v. Crane Co.*, 976 A.2d 193, 197 (D.C. 2009) (internal quotation marks and citation omitted). "Where the contract language is not susceptible of a clear and definite meaning—i.e., where the contract is determined by the court to be ambiguous—external evidence may be admitted to

explain the surrounding circumstances and the positions and actions of the parties at the time of contracting." *Aziken*, *supra*, 70 A.3d at 219 (internal quotation marks and citation omitted).

"[I]f the provisions of the contract are ambiguous, the correct interpretation becomes a question for a factfinder." *Debnam*, *supra*, 976 A.2d at 197-98. However, "a contract is not ambiguous merely because the parties do not agree over its meaning, and courts are enjoined not to create ambiguity where none exists." *Tillery*, *supra*, 912 A.2d at 1177 (internal quotation marks and citation omitted). Generally, we "determine what a reasonable person in the position of the parties would have thought the disputed language meant." *Travelers Indem. Co. v. United Food & Commercial Workers Int'l Union*, 770 A.2d 978, 986 (D.C. 2001) (internal quotation marks and citation omitted). We also examine the document on its face, giving the language used its plain meaning, unless, in context, it is evident that the terms used have a technical or specialized meaning." *Interstate Fire & Cas. Co. v. Washington Hosp. Ctr. Corp.*, 758 F.3d 378, 383 (D.C. Cir. 2014) (citing *Beck v. Continental Cas. Co.* (*In re May*), 936 A.2d 747, 751 (D.C. 2007)) (internal quotation marks omitted). We follow "[t]he general rule applicable in the interpretation of an insurance policy . . . that, if its language is reasonably open to two constructions, the one most favorable to the insured will be adopted." *Chase v.*

*State Farm Fire & Cas. Co.*, 780 A.2d 1123, 1127 (D.C. 2001).

### *The Contract's Definition of Professional Services*

Here, the definition of "professional services" in the insurance contract at issue is not a simple one; nor are the corporate structure of CCC and the underlying complaints simple. The professional services definition consists of eight subparts and is not easy to interpret, although it generally uses ordinary words. Significantly, important terms are not defined, including "investment management services" and "management services," although terms such as "management control" are defined. The definition of professional services makes no mention of other important terms such as "corporate governance" and whether that is subsumed under the concept of "management services." Still other terms which are used repeatedly in the subparts of the definition, including "fund," "organization," and "portfolio entity," are not defined, and there are no discovery documents or depositions bearing on their meaning. Nevertheless, principles of contract interpretation require that we interpret the policy "as a whole, giving a reasonable, lawful, and effective meaning to all its terms, and ascertaining the meaning in light of all the circumstances surrounding the parties at the time the contract was made." *Debnam*, *supra*, 976 A.2d at 197. Thus, we cannot, as appellees urge in support of

the trial court's approach, declare some parts of the professional services definition as "irrelevant," instead of allowing the case to proceed to discovery so that the court may have the benefit of "the surrounding circumstances and the positions and actions of the parties at the time of contracting." We believe that the term "professional services" as used in the insurance policy is reasonably open to more than one construction, and hence, the one most favorable to the insured must be adopted. *Chase*, *supra*, 780 A.2d at 1127. In short, we hold that the definition of professional services in appellants' private equity management and professional liability insurance contract is ambiguous, *Aziken*, *supra*, 70 A.3d at 219, and thus, the correct interpretation [of the professional services definition and the contract] [is] a "question for a factfinder," *Debnam*, *supra*, 976 A.2d at 197-98.

### *Review of the Underlying Claims and the Duty to Defend*

There is another reason why we are constrained to reverse the trial court's Rule 12 (b)(6) judgment in this case. Based on the record before us, we cannot be sure that at the early Rule 12 (b)(6) phase of the litigation, the trial court applied legal principles governing not only the disposition of Rule 12 (b)(6) motions, but also pertinent legal principles governing both the duty of an insurance company to defend the insured and the obligation of the trial court to compare the underlying

complaints with the insurance contract. We previously indicated that the trial court must accept as true the factual allegations in a well-pleaded complaint and must not dismiss the complaint because the court believes that recovery by an appellant is very remote and unlikely. *See Logan*, *supra*, 80 A.3d at 1019; *Equal Rights Ctr.*, 110 A.3d at 603. We now set forth other pertinent and applicable legal principles.

### *Applicable Legal Principles*

To determine whether an insurance company has the duty to defend an insured, this court examines both the underlying complaint and the insurance policy. *Stevens*, *supra*, 801 A.2d at 66; *see also Fogg v. Fidelity Nat'l Title Ins. Co.*, 89 A.3d 510, 512 (D.C. 2014) (this court applies the "eight corners rule" set forth in *Stevens*, *supra*,—compare the four corners of the complaint with the four corners of the insurance policy). We must construe the underlying complaints in favor of the insured. *Adolph Coors Co. & Brewing Co. v. Truck Ins. Exch.*, 960 A.2d 617, 623 (D.C. 2008). "If the allegations of the complaint state a cause of action within the coverage of the policy the insurance company must defend." *Stevens*, *supra*, 801 A.2d at 66 n.5. "The duty to defend is broader than the duty to indemnify, and an insurer may have to defend before it is clear whether there is a duty to indemnify." *Centennial Ins. Co.*, *v. Patterson*, 564 F.3d 46, 50 (1st Cir. 2009) (citation omitted).

If there is no duty to defend, there is no duty to indemnify. *Massamont Ins. Agency, Inc. v. Utica Mut. Ins. Co.*, 489 F.3d 71, 75 (1st Cir. 2007) (citation omitted).

If a professional liability policy contains policy exclusions, the policy "do[es] not insure against all liability incurred by the insured." *See Zurich Am. Ins. Co. v. O'Hara Reg'l Ctr. for Rehab.*, 529 F.3d 916, 924 (10th Cir. 2008). However, "exclusions from coverage are to be strictly construed, and any ambiguity in the exclusion must be construed against the insurer." *Hakim v. Massachusetts Insurers' Insolvency Fund*, 675 N.E. 2d 1161, 1165 (Mass. 1997) (internal quotation marks and citation omitted). "Where an insurer attempts to avoid liability under an insurance policy on the ground that the loss for which recovery is sought is covered by some exclusionary clause, the burden is on the insurer to prove the facts which bring the case within the specified exception." *Cameron v. USAA Property & Cas. Ins. Co.*, 733 A.2d 965, 968 (D.C. 1999).

"When the underlying lawsuit alleges injuries resulting from the provision of both professional services and non-professional services, a professional services exclusion does not negate the . . . duty to defend." *National Cas. Co. v. Western World Ins. Co.*, 669 F.3d 608, 615 (5th Cir. 2012) (citation omitted). "[P]rofessional services exclusions do not limit insurers' duty to defend lawsuits

alleging injuries that result in part from the performance of administrative tasks...."
*Id*. at 616.

### *The Claims in the Underlying Lawsuits*

On the record in this case and at the Rule 12 (b)(6) phase of the litigation, we have substantial doubt as to whether the trial court properly applied the "eight corners rule" in determining whether appellees had the duty to defend appellants. We certainly agree with the trial court that it is not required "to scrutinize each count in each complaint with a dictionary in one hand and The Chicago Manual of Style in the other" in reviewing the underlying complaints. However, more than a cursory review of the underlying complaints and the policy exclusion is required in this case, and it must be clear, without sweeping generalizations, that all claims in the underlying complaints fall squarely within the professional services exclusion, and thus, as a matter of law appellants have not stated a claim for relief that is plausible on its face, *Logan*, *supra*, 80 A.3d at 1019, and they can prove no set of facts which would support their claim for defense costs, *Schiff*, *supra*, 697 A.2d at 1196.

The underlying amended CCC liquidators complaint covers approximately 121 pages and raises nineteen individual claims against CCC's directors, CIM, and

Carlyle; these claims pertain to alleged breach of fiduciary and other duties, breach of fiduciary duty as a de facto or shadow director, wrongful trading under Guernsey law, breach of contract, gross negligence or negligence, unjust enrichment, and the claim for the return of CCC's books and records and other property. It is not clear from the trial court's order why all aspects of these claims, as pled, fall under the policies' professional services exclusion, as a matter of law, given our conclusion that the professional services definition is ambiguous. With respect to the Huffington complaint, filed first in Massachusetts and then in Delaware, it is not clear from the trial court's order, as appellants contend, why misstatements and omissions of material fact made after Mr. Huffington's investment took place, fall under the professional services exclusion, as a matter of law. The same may be said with respect to the shareholders complaint.

Accordingly, for the foregoing reasons, we vacate the trial court's order of dismissal and remand this case to the trial court for discovery, and for dispositive motions or trial.

*So ordered.*