# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued April 21, 2017　　　　　　Decided June 30, 2017

No. 16-7128

HENSEL PHELPS CONSTRUCTION CO.,
APPELLANT

v.

COOPER CARRY INC.,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:15-cv-01961)

*Catherine E. Stetson* argued the cause for appellant. With her on the briefs was *Eugene A. Sokoloff*.

*Paul J. Kiernan* and *Stephen B. Shapiro* were on the brief for *amicus curiae* The Associated General Contractors of America and Associated General Contractors of Metropolitan Washington D.C. in support of appellant.

*Jonathan C. Shoemaker* argued the cause for appellee. With him on the brief was *James F. Lee Jr.*

Before: BROWN and PILLARD, *Circuit Judges*, and SILBERMAN, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* BROWN.

BROWN, *Circuit Judge*:    This controversy concerns breach-of-contract and indemnification claims arising out of alleged defects in the design of the Marriott Marquis Hotel adjacent to the Walter E. Washington Convention Center ("the Project").    Hensel Phelps Construction Company ("Hensel Phelps") claims Cooper Carry "materially breached" its contractual obligations in eighteen respects, including by failing to meet the applicable standard of care and by failing to design the Project in accordance with applicable fire codes. Compl. ¶ 24, J.A. 10–11.  Additionally, Hensel Phelps argues Cooper Cary is contractually obligated to indemnify Hensel Phelps for the losses associated with rectifying the alleged design errors.  The district court granted summary judgment to Cooper Carry on both counts.  We hold that the statute of limitations has run on Hensel Phelps's breach-of-contract claim, and the terms of the indemnification clause do not cover first-party claims.  We accordingly affirm.

I.

A.

Marriott International entered into an initial Agreement with Cooper Carry on March 5, 2008, under which Cooper Carry agreed to design and monitor the construction of the Project for a lump sum of $14,335,602.   The Agreement divided Project completion into five phases: conceptual design, schematic design, design development, construction document, and construction contract administration.  As the Project progressed, Cooper Carry would bill Marriott on a monthly basis, and final payment was due to Cooper Carry upon, among other things, "the full completion of the services hereunder."    Agreement  Art.  4.05.6,  J.A.  25.    The

construction contract administration phase obligated Cooper Carry to perform tasks such as "shop drawing and construction materials sample review and approval, answering requests for information from contractor(s), preparing construction contract change order and field orders, confirming the contractors' percentage of completion of work to substantiate payment requests, reviewing and approving construction mock-ups, and conducting site observations and preparing reports." J.A. 39. It also required Cooper Carry to provide construction administration services as set forth in the as-of-yet-unwritten construction contract for the Project. Once the construction contract between Marriott and the construction entity was finalized, it would be sent to Cooper Carry for approval and incorporated by reference into the initial Agreement.

Cooper Carry made numerous promises in the initial Agreement, two of which are particularly relevant to this litigation. First, Cooper Carry agreed to act in accordance with "the professional standards of skill, care and diligence ordinarily expected of leading, internationally recognized architectural firms on projects of comparable scope and complexity." Agreement Art. 2.01, J.A. 17. Second, Cooper Carry represented it was knowledgeable of all applicable laws, "codes, ordinances, rules, regulations and other requirements imposed by [relevant] governmental authorities," "all . . . governmental approval requirements," and "National Fire Protection Association ('NFPA') standards." Agreement Art. 2.05.1, J.A. 19–20. With respect to fire safety specifically, Cooper Carry agreed to design the Project in conformity with "the BOCA National Building Codes, the NFPA National Fire Codes (especially NFPA 101, Life Safety Code) and the Marriott Fire Protection/Life Safety design." J.A. 49. In addition to its service-related obligations and representations, Cooper Carry acknowledged "Marriott

may sustain financial loss for which [Cooper Carry] may be liable if the Project or any part thereof is delayed because [Cooper Carry] negligently fails to perform the Services in accordance with this Agreement, including, but not limited to, the Schedule." Agreement Art. 3.01, J.A. 22. Cooper Carry also agreed to indemnify Marriott "[t]o the fullest extent permitted by law, . . . from and against any claim, judgment, lawsuit, damage, liability, and costs and expenses, including reasonable attorneys' fees, as a result of, in connection with, or as a consequence of [Cooper Carry's] performance of the Services under this Agreement . . . ." Agreement Art. 6.01, J.A. 27.

The initial Agreement contained a dispute-resolution provision, which allowed "[a]ny party . . . *from time to time*" to "call a special meeting for the resolution of disputes that would have a material impact on the cost or progress of the Project." Agreement Art. 7.09.1, J.A. 31 (emphasis added). If an informal dispute-resolution process failed, the parties agreed to attempt mediation, which would last no more than twenty working days unless the parties agreed otherwise. "If [a] dispute [was] settled through the mediation process, the decision [would] be implemented by written agreement signed by all the parties involved." Agreement Art. 7.09.2, J.A. 31. The Agreement provided that "[a]ll claims and disputes not settled by mediation shall be resolved through litigation in [the] court having jurisdiction over same." Agreement Art. 7.09.3, J.A. 32. Additionally, the Agreement provided that "[t]he presence of any claim or dispute, *or legal proceeding* arising hereunder shall not relieve [Cooper Carry] from its obligation to properly perform its Services as set forth herein, nor shall it relieve Marriott from making payments with respect to undisputed Services in accordance with the terms of this Agreement." Agreement Art. 7.09.5, J.A. 32 (emphasis added).

5

B.

As stated above, the initial Agreement, signed in 2008, contemplated that Marriott would enter into a second contract governing the Project's construction. Approximately two-and-a-half years later, however, the Project was converted to the design-build model of delivery. Under this approach, the owner contracts with only one party—the design-builder—to both design and construct a project. 1 PHILIP L. BRUNER & PATRICK J. O'CONNOR, JR., ON CONSTRUCTION LAW § 2:17 (Dec. 2016) [hereinafter BRUNER & O'CONNOR]. To accomplish this conversion, HQ Hotels—which had previously acquired development rights for the Project from Marriott—entered into a Design/Build Agreement with Hensel Phelps on October 26, 2010, under which Hensel Phelps agreed to complete the Project's construction "no later than April 1, 2014" for a guaranteed maximum price of $354,517,391. Claim Narrative at 2, J.A. 230. Also on October 26, 2010, Marriott assigned its rights and obligations under the initial Agreement to Hensel Phelps, without making any changes to that document. Accordingly, "any and all duties, obligations, and standards of care that Cooper Carry owed to Marriott under the [initial Agreement] were assigned and transferred to Hensel Phelps." Compl. ¶ 10, J.A. 7. Thereafter, the Project "progressed effectively on a design-build basis[,] with Cooper Carry having complete design coordination." Claim Narrative at 2, J.A. 230. As of October 26, Cooper Carry had completed the first three phases of the Project and was in the midst of completing the fourth. The Design/Build Agreement also included a list of already-completed design documents provided by Cooper Carry.

Unfortunately, the new arrangement went sour rather quickly. On March 8, 2011, Cooper Carry met with the District of Columbia Department of Consumer and

Regulatory Affairs and was promptly informed that its designs did not comply with applicable fire codes. Hensel Phelps claims that remedying these errors cost it $4,402,380 and required "significant" design alterations, "[s]ignificant changes in mechanical and electrical scopes," and a ten-and-a-half-month delay in the Issued for Construction design issuance. *See* Claim Narrative at 11–14, J.A. 239–42. Over the next three years, Hensel Phelps contends it discovered approximately seventeen additional defects in Cooper Carry's designs that, when combined with the fire safety issues, allegedly cost $8,493,556 to remediate.

Hensel Phelps initiated dispute-resolution proceedings in January 2015, raising, *inter alia*, breach-of-contract, indemnification, and negligent misrepresentation claims. Regarding breach of contract, it asserted Cooper Cary "failed to meet the high standard stated in the [initial Agreement] *and/or breached Cooper Carry's obligations* therein," Claim Narrative at 2, J.A. 230 (emphasis added), including its "obligations," "warranties," and "representations" pertaining to "fire and life safety design," *id.* at 8–9, 11, J.A. 236–37, 239. *See also* Claim Narrative at 12, J.A. 240 ("This failure to address fire and life safety is an express breach of the fire and life safety obligations contained in the [initial Agreement] Scope of Work."). In support of its allegations, Hensel Phelps submitted a detailed Claim Narrative describing the eighteen alleged breaches and their respective costs.

Mediation failed in October 2015. Hensel Phelps filed a complaint in district court the following month, alleging breach-of-contract and indemnification claims. Cooper Carry moved to dismiss or, alternatively, for summary judgment, arguing the District of Columbia ("D.C.") three-year statute of limitations for contract claims had already run. Additionally, it asserted the plain text of the initial Agreement's

indemnification clause did not cover first-party claims. Cooper Carry attached Hensel Phelps's Claim Narrative to its motion, and Hensel Phelps did not object.

The district court granted summary judgment for Cooper Carry. *Hensel Phelps Constr. Co. v. Cooper Carry, Inc.*, 210 F. Supp. 3d 192, 195 (D.D.C. 2016). It found the contract was first breached—and the statute of limitations therefore began to run—on October 26, 2010, when Hensel Phelps assumed Marriott's rights under the initial Agreement and Cooper Carry delivered the defective design documents. *Id.* at 197 ("Once the time for compliant performance had passed and Hensel Phelps had accepted the initial design documents on which its claim for damages is based, the clock began to run against Hensel Phelps."); *see also id.* at 198. The court also found the text of the initial Agreement's indemnification clause did not cover first-party claims, noting that, in accordance with the traditional purpose of such clauses, it "clearly anticipate[d] the problem of third-party litigation." *Id.* at 199.

Hensel Phelps now appeals, arguing—as it did below— that the contract was not breached until April 1, 2014, when the Project was substantially complete. It asks this Court either to reverse the district court's judgment or to remand for further proceedings to interpret the allegedly ambiguous provisions of the initial Agreement.

Hensel Phelps is organized under the laws of Delaware with its principal place of business in Colorado; Cooper Carry is a Georgia-based corporation with its principal place of business in Georgia. The district court had diversity jurisdiction under 28 U.S.C. § 1332, and we have jurisdiction under 28 U.S.C. § 1291.

8

II.

A.

This Court reviews the district court's grant of summary judgment *de novo*, "examin[ing] the record to determine whether any genuine issue of material fact pertinent to the ruling remains, and if not, whether the substantive law was correctly applied." *Caiola v. Carroll*, 851 F.2d 395, 398 (D.C. Cir. 1988). All inferences are drawn in the nonmovant's favor. *Walker v. Johnson*, 798 F.3d 1085, 1091 (D.C. Cir. 2015). "[A]mbiguity in a contract raises a genuine issue of material fact, which is for the factfinder to resolve." *Debnam v. Crane Co.*, 976 A.2d 193, 198 (D.C. 2009) (quoting *Rastall v. CSX Transp., Inc.*, 697 A.2d 46, 51 (D.C. 1997)).

B.

All parties agree D.C. law governs this case. *See also* Agreement Art. 7.10, J.A. 32. D.C. Code § 45-401(a) directs courts to look to the common law where statutes are silent. D.C. imported the common law of Maryland as of 1801, and so D.C. courts have "customarily[] looked to post-1801 decisions of the Court of Appeals of Maryland for assistance in interpreting the law." *Heard v. United States*, 686 A.2d 1026, 1029 (D.C. 1996); *see also Little v. United States*, 709 A.2d 708, 711 (D.C. 1998).

D.C. courts "adhere[] to an objective law of contracts." *Carlyle Inv. Mgmt. L.L.C. v. Ace Am. Ins. Co.*, 131 A.3d 886, 894–95 (D.C. 2016). This means "the written language embodying the terms of an agreement will govern the rights and liabilities of the parties regardless of the intent of the parties at the time they entered the contract, unless the written language is not susceptible of a clear and definite meaning."

*Id.* "The writing must be interpreted as a whole, giving a reasonable, lawful, and effective meaning to all its terms, and ascertaining the meaning in light of all the circumstances surrounding the parties at the time the contract was made." *Id.* at 895. "In determining whether a contract is ambiguous, [courts] examine the document on its face, giving the language used its plain meaning," *Debnam*, 976 A.2d at 197, "unless, in context, it is evident that the terms used have a technical or specialized meaning," *Carlyle*, 131 A.3d at 895. In essence, courts "determine what a reasonable person in the position of the parties would have thought the disputed language meant." *Id.* at 895. Furthermore, "a contract is not ambiguous merely because the parties do not agree over its meaning, and courts are enjoined not to create ambiguity where none exists." *Id.*

Under D.C. law, parties have three years "from the time the right to maintain the action accrues" to file a breach-of-contract claim. D.C. CODE § 12-301(7). "Accrue" is not defined, but "[a]ctions usually accrue when they come into existence." *Felter v. Kempthorne*, 473 F.3d 1255, 1259 (D.C. Cir. 2007). "An action for breach of contract generally accrues at the time of the breach." *Wright v. Howard Univ.*, 60 A.3d 749, 751 (D.C. 2013); *Murray v. Wells Fargo Home Mortg.*, 953 A.2d 308, 319–20 (D.C. 2008).

III.

A.

Hensel Phelps and Cooper Carry disagree about what "first breach" rule this Court should apply to their contract. Hensel Phelps argues the Project is governed by a unitary construction contract, under which courts typically interpret first breach as occurring upon "substantial completion" of the Project. *See* 3 BRUNER & O'CONNOR § 8:23 (defining

"substantial completion" as "that point in the construction where the work is sufficiently complete that the owner may occupy or utilize the work for the use for which it was intended"). Because substantial completion did not occur until April 2014, Hensel Phelps argues its claim is not time-barred. By contrast, relying primarily on *Comptroller of Virginia ex rel. Virginia Military Institute v. King*, 232 S.E.2d 895, 900 (Va. 1977), and *Hilliard & Bartko Joint Venture v. Fedco Systems, Inc.*, 522 A.2d 961, 967 (Md. 1987), Cooper Carry asserts we should view the initial Agreement as a design agreement, and the contract was thus first breached when Hensel Phelps accepted Cooper Carry's defective designs.

We find it unnecessary to wade into this debate, however. For, like most other rules of contract, legal rules that specify first breach are default ones, and parties are free to depart from them as they wish. Looking to the initial Agreement's terms suffices to demonstrate that Hensel Phelps's cause of action accrued prior to substantial completion.

As a preliminary matter, we note the parties consented to have the initial Agreement interpreted according to its "plain meaning." Agreement Art. 7.20, J.A. 35. We think the plain terms of the initial Agreement, read in context, make it clear that Hensel Phelps could have initiated dispute-resolution procedures for breach of contract in March 2011, after discovery of Cooper Carry's failure to design the Project in accordance with applicable fire safety codes. The initial Agreement specified that "[a]ny party may from time to time call a special meeting for the resolution of disputes that would have a material impact on the cost or progress of the Project." Agreement Art. 7.09.1, J.A. 31. No temporal conditions precedent needed to be satisfied before parties could commence dispute resolution; all that was required was a

material effect on either the Project's cost or its progress. According to Hensel Phelps, remedying the fire safety errors cost almost four-and-a-half million dollars, required significant structural and design alterations, and resulted in a ten-and-a-half-month delay in the issuance of a necessary document. The cost and effects on the schedule suggest the fire safety issues met the criteria laid out in Article 7.09.1.

We also read the initial Agreement to *require* parties to proceed to court if dispute resolution failed. Read in full, Article 7 of the initial Agreement set out a series of iterative, sequential steps a party *needed to* walk through in order to resolve a dispute, beginning with informal proceedings and culminating with a lawsuit filed in court. Removing the description of what procedures were to be used within each step of the process, the section provided as follows:

> Any party may from time to time call a special meeting for the resolution of disputes that would have a material impact on the cost or progress of the Project. . . . If the dispute has not been resolved within five (5) working days . . . , a mediator, mutually acceptable to the parties and experienced in design and construction matters *shall be retained* by the parties. . . . If the dispute is settled through the mediation process, the decision *will be implemented* by written agreement signed by all the parties involved. . . . All claims and disputes not settled by mediation *shall be resolved* through litigation in court having jurisdiction over same.

Agreement Arts. 7.09.1–7.09.3, J.A. 31–32 (emphases added). The parties added no proviso to the "shall be resolved" language indicating such lawsuits could not commence until after substantial completion of the Project. Nor did they do so

in the section entitled "Causes of Action," which merely stated that "[c]auses of action between the parties to this Agreement . . . shall be deemed to have accrued and the applicable statutes of limitations shall commence to run in accordance with the law applicable to this Agreement." Agreement Art. 7.15, J.A. 34. And, in fact, the initial Agreement expressly contemplated the possibility of litigation before its completion. Article 7.09.5—contained within the same section as the dispute-resolution procedures—stated that "[t]he presence of any . . . legal proceeding arising hereunder shall not relieve [Cooper Carry] from its obligation to properly perform its Services as set forth herein, nor shall it relieve Marriott from making payments with respect to undisputed Services in accordance with the terms of this Agreement." J.A. 32; *see also* Agreement Art. 5.03, J.A. 26 (permitting Marriott to terminate Cooper Carry for cause "should [Cooper Carry] fail substantially to perform in accordance with the terms of this Agreement"). This provision contained no language cabining its application only to litigation between a party to the initial Agreement and subcontractors, as Hensel Phelps argued at oral argument. *See* Oral Arg. Rec. 14:10–14:59. By its plain terms, and contextualized within Article 7 as a whole, it applied equally to legal disputes between Hensel Phelps and Cooper Carry that had not been "resolved" via the dispute-resolution procedures.

Perhaps Hensel Phelps believed a different first breach rule would apply once the Design/Build Agreement was signed and introduced the concept of substantial completion, a concept absent from the initial Agreement. *See* Design/Build Agreement Art. 6.15, J.A. 120. But this belief was never enshrined objectively in the text of either the assignment agreement or alterations to the initial Agreement's text, and it is objective language, not subjective intent, that guides our

analysis. *Carlyle*, 131 A.3d at 894. Here, the terms are clear and unambiguous: Hensel Phelps had the right to begin dispute-resolution procedures in March of 2011 and to bring a lawsuit in court if and when those proceedings failed. We must hold Hensel Phelps to its bargain. Because it filed its complaint more than three years after the action accrued, its breach-of-contract claim is time-barred.[1]

## B.

We similarly find Hensel Phelps's indemnification argument unavailing.

Hensel Phelps contends the initial Agreement's indemnification clause used broad and expansive language and contained no limitation confining its scope only to third-party claims. Like any other contractual provision, indemnification clauses must be interpreted by looking to the

---

[1] We also find it noteworthy that Hensel Phelps's characterization of events corresponds with our interpretation. Though Hensel Phelps argued to this Court that first breach could not have occurred until after substantial completion, it repeatedly described Cooper Carry's actions as "breaches" in its Claim Narrative. We recognize the initial Agreement provided that "no reference to . . . any admissions against interest made in the course [of mediation] may be made or offered as evidence in any subsequent litigation." Agreement Art. 7.09.2, J.A. 31. However, Cooper Carry drew attention to Hensel Phelps's characterizations in its response brief. Appellee Br. 11–12. Hensel Phelps failed to object in its reply brief and expressly disclaimed the Narrative as a statement against interest at oral argument. *See* Oral Arg. Rec. 15:45–17:00. Thus, whatever protection the Agreement provided against reliance on admissions in the course of mediation is arguably forfeited. We need not resolve this forfeiture issue, however; even leaving aside Hensel Phelps's descriptions, Cooper Carry is entitled to summary judgment.

objective language as the expression of the parties' intent. However, this objective analysis also considers the context in which words are used. *Holland v. Hannan*, 456 A.2d 807, 816–17 (D.C. 1983); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 202 (1981) ("[t]he meaning of words . . . commonly depends on their context."). Contextual analysis allows courts to "determine what a reasonable person in the position of the parties would have thought the disputed language meant," as well as to determine if, "in context, it is evident that the terms used have a technical or specialized meaning." *Carlyle*, 131 A.3d at 895.

Unquestionably, indemnification clauses have traditionally been used and interpreted as extending only to third-party claims. 3 BRUNER & O'CONNOR § 10:39; 42 C.J.S. *Indemnity* § 1 (June 2017). In the initial Agreement, the terms "claim, judgment, lawsuit, damage, liability, and costs and expenses," Art. 6.01, J.A. 27, must be interpreted in light of this traditional function. Furthermore, the D.C. Court of Appeals has advocated for strict construction of indemnification clauses to avoid covering "any obligations which the parties never intended to assume." *Am. Bldg. Maint. Co. v. L'Enfant Plaza Props.*, 655 A.2d 858, 861 (D.C. 1995); *see also id.* (noting "[t]here is no liability to indemnify unless it is plainly spelled out in the contract"); *James G. Davis Constr. Corp. v. HRGM Corp.*, 147 A.3d 332, 340–41 (D.C. 2016) (reading an indemnification clause covering "any and all costs and expenses" to reach first-party claims by looking to a second indemnification clause protecting only against "loss or losses directly connected with the performance of the Construction Contract" and reasoning the parties purposely chose a broader formulation for the clause at issue). Here, no clear and unequivocal intent to include first-party claims appears on the face of the instrument and,

15

construing the clause strictly, we decline to expand the scope of its reach.[2]

IV.

For the foregoing reasons, the judgment of the district court is

*Affirmed.*

---

[2] Hensel Phelps argued, both below and to this Court, that the bulk of its indemnification claims—approximately 7.2 million dollars' worth—*do* constitute third-party claims. It defined third-party claims as those charged to Hensel Phelps by subcontractors, whereas first-party claims are those incurred directly by Hensel Phelps, such as additional overhead and administration costs. *See* Oral Arg. Rec. 24:43–27:34. But all first-party claims involve some payout to a third party. For instance, in Hensel Phelps's example of additional administrative costs, Hensel Phelps must pay out to a third party—its employee—to provide that administration service. Reading the clause according to Hensel Phelps's interpretation would render it no different than a standard breach-of-contract claim, and we decline to do so here.