*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 20-CV-0535

ROSE'S 1, LLC, *et al.*, APPELLANTS,

v.

ERIE INSURANCE EXCHANGE, APPELLEE.

Appeal from the Superior Court of the
District of Columbia
(2020-CA-002424-B)

(Hon. Kelly A. Higashi, Trial Judge)

(Argued November 30, 2021      Decided March 2, 2023)

*Michael C. Davis*, with whom *David L. Feinberg*, *Mary M. Gardner*, and *Jonathan K. Hettleman* were on the brief, for appellants.

*George E. Reede*, with whom *Jessica E. Pak* was on the brief, for appellee.

*Scott Levitt*, with whom *Georgia Kazakis*, *Dustin Cho*, and *Mark Mosier* of Covington & Burling LLP, filed a brief on behalf of Local Restaurants Insured by Erie Insurance Exchange as *amicus curiae*.

*Lorelie S. Masters*, with whom *Geoffrey B. Fehling* and *Latosha M. Ellis* of Hunton Andrews Kurth, LLP, filed a brief on behalf of United Policy Holders and National Independent Venue Association as *amicus curiae*.

*Laura A. Foggan* of Crowell & Moring LLP filed a brief on behalf of The American Property Casualty Insurance Association and National Association of Mutual Insurance Companies as *amicus curiae*.

*Victoria S. Nugent*, with whom *Andrew N. Friedman*, *Julie Selesnick*, *Geoffrey Graber*, and *Karina G. Puttieva* of Cohen Milstein Sellers & Toll PLLC, *Andre M. Mura*, of Gibbs Law Group LLP, and *Angelo I. Amador* of Restaurant Law Center, filed a brief on behalf of Restaurant Association of Metropolitan Washington and Restaurant Law Center as *amicus curiae*.

Before BLACKBURNE-RIGSBY, *Chief Judge*, BECKWITH, *Associate Judge*, and THOMPSON,[*] *Senior Judge*.

BLACKBURNE-RIGSBY, *Chief Judge*: Several restaurants and food service businesses[1] in the District of Columbia are appealing a summary judgment ruling in favor of appellee, Erie Insurance Exchange ("Erie"). The trial court determined that the Erie Ultrapack Plus Policy ("Policy") held by appellants throughout the COVID-19 pandemic did not provide coverage for the loss of use of their businesses due to the pandemic and governmental shutdown orders. Appellants are seeking reversal and a determination that they are entitled to insurance coverage for lost income and extra expenses associated with the COVID-19 pandemic and mayoral orders, which appellants assert resulted in the direct loss of use of their properties to operate their businesses. We affirm the grant of summary judgment.

---

[*] Judge Thompson was an Associate Judge of the court at the time of argument. She began her service as a Senior Judge on February 18, 2022.

[1] Rose's Luxury, Pineapple and Pearls, Little Pearl, Buttercream Bakeshop, Gravitas, Karma Modern Indian, Purple Patch, El Chucho, Bar Charley, La Vie, Queen's English, Beuchert's Saloon, Service Bar, and Maketto.

## I. Factual & Procedural History

### A.     COVID-19 Pandemic

Between March 11 and 13, 2020, the World Health Organization ("WHO") declared a global pandemic as a result of the spread of COVID-19.[2]  In response, Mayor Muriel Bowser of the District of Columbia declared a public health emergency due to COVID-19 on March 11, 2020.[3]  Next, on March 16, 2020, Mayor Bowser issued a mandatory order prohibiting "table seating" at restaurants, bars, and taverns operating in the District.[4]  By March 24, 2020, the severity of the pandemic had grown, and Mayor Bowser ordered the closure of all non-essential businesses,

---

[2] *Timeline: WHO's COVID-19 Response*, World Health Org., https://www.who.int/emergencies/diseases/novel-coronavirus-2019/interactive-timeline; https://perma.cc/GLJ4-3H8B (last visited February 13, 2023).

[3] Mayor's Order 2020-045: Declaration of Public Health Emergency – Coronavirus (COVID-19), Exec. Off. of the Mayor (Mar. 11, 2020), https://mayor.dc.gov/sites/default/files/dc/sites/mayormb/release_content/attachments/MO.DeclarationofPublicEmergency03.11.20.pdf; https://perma.cc/52FS-VLJ5.

[4] Mayor's Order 2020-048: Prohibition on Mass Gatherings During Public Health Emergency – Coronavirus (COVID-19), Exec. Off. of the Mayor (Mar. 16, 2020), https://mayor.dc.gov/sites/default/files/dc/sites/mayormb/publication/attachments/MO-Prohibition-on-Mass-Gatherings-During-Public-Health-Emergency.pdf; https://perma.cc/AUU9-ZT95.

which included restaurants and bars.[5]  Several days later, on March 30, 2020, the Mayor issued a stay-at-home order, directing the residents of the District to stay at home except for limited essential purposes, which did not include dining at restaurants.[6]  As the pandemic continued, to ensure public safety, the Mayor extended the orders closing all non-essential businesses and requiring residents to stay at home.

The reopening of the District of Columbia occurred in phases.  During Phase I, Mayor Bowser lifted the stay-at-home order, and, with respect to dining establishments, allowed restaurants to offer limited outdoor dining services.[7]  In Phase II, restaurants and bars were permitted to open with limited seating and

---

[5] Mayor's Order 2020-053: Closure of Non-Essential Businesses and Prohibition on Large Gatherings During Public Health Emergency for the 2019 Novel Coronavirus (COVID-19), Exec. Off. of the Mayor (Mar. 24, 2020), https://coronavirus.dc.gov/sites/default/files/dc/sites/mayormb/release_content/atta chments/Mayor%27s%20Order%202020-053%20Closure%20of%20Non-Essential%20Businesses%20and%20Prohibiti....pdf; https://perma.cc/T56N-UZP3.

[6] Mayor's Order 2020-054: Stay at Home Order, Exec. Off. Of the Mayor (Mar. 30, 2020), https://mayor.dc.gov/release/mayor-bowser-issues-stay-home-order; https://perma.cc/BWQ4-Y9ZR.

[7] Mayor's Order 2020-067: Phase One of Washington, DC Reopening, Exec. Off. of the Mayor (May 27, 2020), https://coronavirus.dc.gov/sites/default/files/dc/sites/coronavirus/page_content/atta chments/MO2020-067.pdf; https://perma.cc/UZ72-VS7X.

socially-distanced indoor dining.[8]  Mayor Bowser ordered the end of the public health emergency on July 24, 2021, to take effect July 25, 2021.[9] After subsequent extensions, the public emergency ended on April 16, 2022.[10]

## B.    The Policy

Prior to and throughout the COVID-19 pandemic, appellants were insured by Erie, each having previously acquired the Policy insurance package.  With regard to coverage, the Policy states that Erie "will pay for direct physical 'loss' of or damage to Covered Property at the premises described in the 'Declarations' caused by or

---

[8] Mayor's Order 2020-075: Phase Two of Washington, DC Reopening, Exec. Off. of the Mayor, (June 19, 2020), https://coronavirus.dc.gov/sites/default/files/dc/sites/coronavirus/page_content/atta chments/Mayors-Order-2020-075-06-19-20.pdf; https://perma.cc/VSJ3-HQVX.

[9] Mayor's Order 2021-096: End of Public Health Emergency and Extension of Public Emergency, Exec. Off. of the Mayor, (July 24, 2021), https://coronavirus.dc.gov/sites/default/files/dc/sites/coronavirus/page_content/atta chments/Mayors-Order-2021-096.pdf; https://perma.cc/TUJ8-TNWV.

[10] Mayor's Order 2022-043: Extension of Public Emergency for COVID-19, Exec. Off. of the Mayor, (Mar. 17, 2022), https://coronavirus.dc.gov/sites/default/files/dc/sites/coronavirus/page_content/atta chments/2022-043_Extension_of_Public_Emergency_for_COVID-19.pdf; https://perma.cc/H89C-4W6U.

resulting from a peril insured against."[11]  The Policy included three types of coverage: (1) building coverage, (2) personal property coverage, and (3) Income Protection and Extra Expense coverage (referred to in the Policy as "Coverage 3"). Appellants opted to purchase additional Income Protection and Extra Expense coverage as part of their Policy with Erie.  The sole issue on appeal pertains to the interpretation of the Income Protection and Extra Expense coverage under the Policy.

Per the Policy, Income Protection "insures against direct physical 'loss[,]' except 'loss' as excluded or limited in this policy."[12]  As defined by the Policy, "Income Protection" means

> loss of "income" and/or "rental income" you sustain due to partial or total "interruption of business" resulting directly from "loss" or damage to property on the premises described in the "Declarations" from a peril insured against.  "Loss" or damage also includes covered property in the open, or in a vehicle, on the premises described in the "Declarations" or within 1,500 feet thereof.  If you are a tenant, your premises are the portion of the building described in the "Declarations" which:
>
> 1.    You rent, lease, or occupy;

---

[11] Section III of the Policy includes an extensive list of exclusions.

[12] Some examples of excluded losses under the Policy are: deterioration or depreciation, intentional loss, earth movement (earthquakes, tremors, landslides, etc.), volcanic action, war, seizure or destruction by order of government, etc.  Erie does not argue that there is an express virus or pandemic exclusion in the Policy.

2.     All routes within the building that service or are used to gain access to the described premises; and

3.     The area within 1,500 feet of the premises described in the "Declarations" (with respect to "loss" or damage to covered property in the open or in a vehicle).

You are required to resume normal business operations as promptly as possible and shall use all available means to eliminate any unnecessary delay.

"Extra Expense" is defined as

necessary expenses you incur due to partial or total "interruption of business" resulting directly from "loss" or damage to property on the premises described in the "Declarations" from a peril insured against.  "Loss" or damage also includes property in the open, or in a vehicle, on the premises described in the "Declarations" or within 1,500 feet thereof.

The Policy defines "interruption of business" as "the period of time that a business is partially or totally suspended . . .  [b]egin[ning] with the date of direct 'loss' to covered property caused by a peril insured against" and "[e]nd[ing] on the date when the covered property should be repaired, rebuilt, or replaced with reasonable speed and similar quality."

The Policy states that Erie

will pay necessary actual and necessary "extra expenses" (other than the expense to repair or replace property) sustained by you to: . . . [a]void or minimize the

"interruption of business" and to continue your business operations . . . . [and] [m]inimize the "interruption of business" if you cannot continue your business operations to the extent it reduces the amount of loss that would have been payable under loss of "income" . . . .

Under the Income Protection and Extra Expense provisions of the Policy, the term "loss" is defined as "direct and accidental loss of or damage to covered property."

## C.    Trial Court Litigation

Appellants timely filed claims with Erie seeking coverage under their respective policies for lost income and extra expenses caused by their required closures and reduced operations due to the COVID-19 pandemic. Erie denied the claims, citing a lack of "direct physical loss to [appellants'] building[s]." Following the denial of their claims, appellants filed a complaint in Superior Court seeking declaratory judgment that their claims were covered by their insurance contracts with Erie. With only the respective parties' differing interpretations of the Policy in dispute, appellants filed a motion for expedited summary judgment, and appellees filed a cross-motion for summary judgment.

Appellants argued that under the plain language of the Income Protection coverage of the Policy, they were insured for the loss of use of their properties as a result of a direct physical loss, which they assert took place through the forced closure of their businesses due to the COVID-19 pandemic. Appellants also argued that because the Policy did not explicitly exclude coverage for loss of use or exclude coverage due to a virus, then the Policy covers their loss of income due to the pandemic. Erie in response argued that the Policy is not ambiguous and absent any physical loss or damage to appellants' properties, mere loss of income was not covered under the Policy.

The trial court denied appellants' summary judgment motion and granted Erie's cross-motion for summary judgment. The trial court determined that pursuant to the Policy, the mayoral orders "did not [affect] any direct changes to the properties" to constitute a "direct physical loss." The trial court rejected appellants' argument that because the Policy defined "loss" as "direct and accidental loss of or damage to covered property," the clause "loss of" must be treated as distinct from "damage," and "loss of" would therefore incorporate "loss of use" and not necessarily be limited to physical damage. The trial court held that "under a natural reading of the term 'direct physical loss,' the words 'direct' and 'physical' modify

the word 'loss;'" and therefore, any loss of use must be caused by "a direct physical intrusion on to the insured property."

The trial court noted that cases cited by appellants, *Gregory Packaging, Inc. v. Travelers Prop. Cas. Co. of Am.*, 2014 U.S. Dist. LEXIS 165232, at *13-19 (D.N.J. Nov. 25, 2014), and *W. Fire Ins. Co. v. First Presbyterian Church*, 437 P.2d 52, 55 (Colo. 1968), did not "stand for the proposition that a governmental edict, standing alone, constitute[d] a direct physical loss under an insurance policy." In addition, the trial court looked to our holding in *Bros. Inc. v. Liberty Mut. Fire Ins. Co.*, 268 A.2d 611, 613 (D.C. 1970), where we interpreted the term "direct loss" to mean "a loss proximately resulting from physical damage to the property or contents caused by a riot or civil commotion." The trial court also reasoned that appellants did not show that COVID-19 was actually present on the insured properties or that the Mayor's orders had "any effect on the material or tangible structure of the insured properties." As such, the trial court concluded that the Mayor's orders were not a physical intrusion on the properties, and the Policy did not provide coverage for appellants' loss of income as a result of the Mayor's shutdown orders. This appeal followed.

## II.    Discussion

On appeal, appellants argue that (1) the trial court erroneously determined that COVID-19 or the mandatory shutdown orders were not the direct cause of their losses, absent some "direct change to the property";  (2) Erie's proposed interpretation of the Policy conflates the distinct meanings of "loss" and "damage" to mean only physical damage, rejecting that "loss of use" is also a "direct physical loss";  and (3) the Policy "requires coverage for all business interruption losses unless they are clearly and unambiguously excluded."  In response, Erie asserts that "loss of use" is not a "direct physical loss" and that a "direct physical loss" requires some type of change to the physical condition of the properties.

For the reasons we discuss, we affirm the trial court's grant of summary judgment to Erie.  First, we conduct a brief survey of the state of COVID-19 business interruption litigation.  Then, we look at the Policy at issue.  We conclude that "loss of use" of appellants' properties as a result of Mayor Bowser's shutdown orders is not a "direct physical loss" that invokes Income Protection coverage.

### A.   COVID-19 Business Interruption Litigation

Courts across the country have dealt with whether the COVID-19 business closures constitute "direct physical loss of or damage to" property, such that the businesses' losses are covered by income-protection coverage.[13]   Conducting a broad survey of the caselaw across state and federal courts, the Eleventh Circuit concluded that the "majority view" is that "some tangible alteration of the property is required."  *SA Palm Beach, LLC v. Certain Underwriters at Lloyd's London*, 32 F.4th 1347, 1358 (11th Cir. 2022) (collecting cases).   As the Seventh Circuit explained,

> The phrase is "direct physical loss or damage."  The words "direct physical" are most sensibly read as modifying both "loss" and "damage."  But even if they can be divorced from "damage" (and we do not think that they can), they indisputably modify "loss."   Any other interpretation would commit the same sin against which the Businesses caution us—namely making surplusage out of the word "physical."  Whatever "loss" means, it must be physical in nature.

*Sandy Point Dental, P.C. v. Cincinnati Ins. Co.*, 20 F.4th 327, 332 (7th Cir. 2021) (applying Illinois law).  Given this language,

---

[13] The parties have filed several Rule 28(k) letters, directing the court to litigation across the country.  We thank the parties for keeping the court abreast of updates in COVID-related business interruption cases.

> The requirement that the loss be "physical," given the ordinary definition of that term, is widely held to exclude alleged losses that are intangible or incorporeal and, thereby, to preclude any claim against the property insurer when the insured merely suffers a detrimental economic impact unaccompanied by a distinct, demonstrable, physical alteration of the property.

*SA Palm Beach, LLC*, 32 F.4th at 1358 (quoting Steven Plitt et al., 10A *Couch on Insurance* § 148:46 (3d ed. & Dec. 2021 update)). Thus, most courts have concluded that there is "no coverage for loss of use based on intangible and incorporeal harm to the property due to COVID-19 and the closure orders that were issued by state and local authorities even though the property was rendered temporarily unsuitable for its intended use." *Id.*[14]

---

[14] *E.g.*, *Wilson v. USI Ins. Serv. LLC*, 57 F.4th 131, 138 (3d Cir. 2023) (applying Pennsylvania and New Jersey law); *Uncork & Create LLC v. Cincinnati Ins. Co.*, 27 F.4th 926, 932 (4th Cir. 2022) (applying West Virginia law); *Q Clothier New Orleans, L.L.C. v. Twin City Fire Ins. Co.*, 29 F.4th 252, 258-59 (5th Cir. 2022) (applying Louisiana law); *Cherokee Nation v. Lexington Ins. Co.*, 521 P.3d 1261, 1267 (Okla. 2022); *Monday Restaurants v. Intrepid Ins. Co.*, 32 F.4th 656, 658 (8th Cir. 2022) (applying Missouri law); *Wakonda Club v. Selective Ins. Co. of Am.*, 973 N.W.2d 545, 553 (Iowa 2022); *10012 Holdings, Inc. v. Sentinel Ins. Co.*, 21 F.4th 216, 220-21 (2nd Cir. 2021) (applying New York law); *Santo's Italian Café LLC v. Acuity Ins. Co.*, 15 F.4th 398, 402 (6th Cir. 2021) (applying Ohio law).

A small number of courts have determined that similar policy language is susceptible to more than one reasonable interpretation.[15] The Eastern District of Virginia explained that "'direct physical loss' has been subject to a spectrum of interpretations in Virginia . . . . Based on the case law, the [c]ourt finds that it is plausible that a fortuitous 'direct physical loss' could mean that the property is uninhabitable, inaccessible, or dangerous to use because of intangible, or non-structural, sources." *Elegant Massage, LLC v. State Farm Mut. Auto. Ins. Co.*, 506 F. Supp. 3d 360, 373-76 (E.D. Va. 2020); *see also In re Soc'y Ins. Co. COVID-19 Bus. Interruption Prot. Ins. Litig.*, 521 F. Supp. 3d 729, 742-43 (N.D. Ill. 2021)

---

[15] *E.g.*, *Cajun Conti LLC v. Certain Underwriters at Lloyd's, London*, 2022 WL 2154863, at *6-8 (La. Ct. App., June 15, 2022); *Risinger Holdings, LLC v. Sentinel Ins. Co., Ltd.*, 565 F. Supp. 3d 844, 863-64 (E.D. Tex. 2021) (applying Texas law); *McKinley Dev. Leasing Co. v. Westfield Ins. Co.*, 2021 WL 8084485, at *4-5 (Ohio C.P. Oct. 14, 2021); *see also Snoqualmie Ent. Auth. v. Affiliated FM Ins. Co.*, 2021 WL 4098938, at *4-6 (Wash. Super. Ct. Sept. 3, 2021) (the phrase "all risks of physical loss or damage" is undefined and ambiguous).

The Pennsylvania Superior Court has come to differing conclusions depending on the policy at issue. In *Ungarean v. CNA & Valley Forge Ins. Co.*, 286 A.3d 353, 360-61 (Pa. Super. Ct. 2022), the court determined that an interpretation that "loss of the use of [a] dental practice due to COVID-19 and the governmental orders equated to a direct physical loss of [the] property" is reasonable. However, in *MacMiles, LLC v. Erie Ins. Exch.*, 286 A.3d 331, 340 (Pa. Super. Ct. 2022), in which the court examined the Erie Ultrapack Plus policy, the court determined that "where the alleged property damage is invisible (as is the possible presence of Covid-19 on surfaces), it does not qualify as physical damage for purposes of a commercial property insurance policy."

(denying summary judgment because "the scope of the term 'direct physical loss' is genuinely in dispute").

Finally, a few courts have recognized a type of "physical damage or loss" where there are "odors, bacteria, and other imperceptible agents . . . if [their] presence renders the structure uninhabitable or unusable, or essentially destroys its functionality." *SWB Yankees, LLC v. CNA Financial Corp.*, 2021 WL 3468995, at *17 (Pa. C.P. Aug. 4, 2021).[16] "In order for an insured to sustain a claim of physical loss or damage based upon the contamination theory . . . , the insured must expressly aver that the coronavirus was present on its covered property." *Id.* at *19 (collecting cases).[17]

---

[16] *Port Auth. of N.Y. & N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 236 (3d Cir. 2002) (presence of asbestos could constitute a "physical loss" if it "result[s] in contamination of the property such that its function is nearly eliminated or destroyed, or the structure is made useless or uninhabitable," because the "effect of asbestos fibers in such quantity is comparable to that of fire, water or smoke on a structure's use and function."); *W. Fire Ins. Co.*, 437 P.2d at 54 (gasoline seeping into a building, making it uninhabitable, could constitute "direct physical loss").

[17] *E.g.*, *Huntington Ingalls Indus., Inc. v. Ace Am. Ins. Co.*, 287 A.3d 515, 527-28 (Vt. 2022) (a "distinct, demonstrable, physical alteration need not necessarily be visible; alterations at the microscopic level may meet this threshold" but it "is essential that the allegations involve more than just a government order interfering with insured's use of its property"); *Mudpie, Inc. v. Travelers Cas. Ins. Co. of Am.*, 487 F. Supp. 3d 834, 841 n.7 (N.D. Cal. 2020) ("Had [the insured] alleged the presence of COVID-19 in its store, the Court's conclusion about an intervening physical force would be different."), *aff'd*, 15 F.4th 885 (9th Cir. 2021).

**B.     This Case**

Like other courts, we are tasked with determining whether appellants have alleged a "direct physical loss of or damage to Covered Property." We determine that they have not. "Direct physical loss of or damage" requires a tangible, material alteration or change to covered property. We make this determination through a plain reading of "direct physical loss of or damage" and a harmonized reading of the Income Protection coverage provisions. "Direct physical loss of or damage" does not include a loss of use, and coverage of "all risks" does not mean that coverage can be extended beyond the Policy's terms. Because appellants have not alleged a tangible change or alteration to their properties, they have not shown "physical loss of or damage to Covered Property" as required by the Policy.

---

California courts seem to be split on whether the allegation of COVID-19 in a business could constitute direct physical loss. *See Another Planet Ent., LLC v. Vigilant Ins. Co.*, 56 F.4th 730, 734 (9th Cir. 2022) (acknowledging a split in California authority and certifying a question to the California Supreme Court on whether "the allegation of the presence or potential presence of the COVID-19 virus is sufficient to show 'direct physical loss or damage to property'").

We review a trial court's order granting summary judgment de novo, assessing whether summary judgment was appropriately granted because there was no genuine issue of material fact and the judgment is warranted as a matter of law. *Liu v. U.S. Bank N.A.*, 179 A.3d 871, 876 (D.C. 2018). In our assessment, we must construe "the evidence in the light most favorable to the non-prevailing party and we draw all reasonable inferences in that party's favor." *Id.* "An insurance policy is a contract that this court construes according to contract principles," *Fogg v. Fid. Nat'l Title Ins. Co.*, 89 A.3d 510, 514 (D.C. 2014), and "[c]ontractual interpretation is a legal question, which this court reviews de novo," *District of Columbia v. D.C. Contract Appeals Bd.*, 145 A.3d 523, 530 (D.C. 2016).

We examine an insurance policy on its face, first assessing the plain language used. *District of Columbia v. Young*, 39 A.3d 36, 40 (D.C. 2012); *see also Carlyle Inv. Mgmt. L.L.C. v. Ace Am. Ins. Co.*, 131 A.3d 886, 896 (D.C. 2016). We must strive to give "reasonable effect to [the contract's] parts" and avoid an interpretation that would render any part of it "meaningless or incompatible" with the policy as a whole. *Young*, 39 A.3d at 40. When interpreting a contract, "we must determine how a reasonable person in the [parties'] position . . . would understand the disputed provision and honor their expressed intentions." *Hossain v. JMU Props., LLC*, 147 A.3d 816, 820 (D.C. 2016). Summary judgment can be appropriate where an

insurance contract's language is not ambiguous "because a written contract duly signed and executed speaks for itself and binds the parties without the necessity of extrinsic evidence." *Stevens v. United Gen. Title Ins. Co.*, 801 A.2d 61, 66 (D.C. 2002) (cleaned up). However, if an insurance policy "is reasonably open to two constructions, the [construction] most favorable to the insured will be adopted." *Carlyle Inc. Mgmt. LLC*, 131 A.3d at 895 (internal quotations omitted).

### 1. "Direct Physical Loss"

We first turn to the Policy's language. The Policy covers "direct physical 'loss' of or damage to Covered Property." The Policy defines "loss" as "direct and accidental loss of or damage to covered property."[18] The Policy does not define "direct physical loss" itself; thus, we must give these terms their plain meaning. *See Carlyle Inc. Mgmt. LLC*, 131 A.3d at 895. Importantly, both "direct" and "physical" modify "loss." "Direct," as commonly understood and as relevant here, generally means "marked by absence of an intervening agency." *Direct*, Merriam-Webster Dictionary, https://www.merriamwebster.com/dictionary/direct;

---

[18] Given this circular definition of "loss," we keep in mind the common understanding of the term, which is "the act or fact of being unable to keep or maintain something" or "partial or complete deterioration." *Loss*, Merriam-Webster Dictionary, https://www.merriamwebster.com/dictionary/loss; https://perma.cc/27S5-T2K2 (last visited February 10, 2023).

https://perma.cc/GXM5-SH75 (last visited February 10, 2023). "Physical," as commonly understood, generally means "having material existence: perceptible especially through the senses and subject to the laws of nature." *Physical*, Merriam-Webster Dictionary, https://www.merriamwebster.com/dictionary/physical; https://perma.cc/F4PE-FAA5 (last visited February 10, 2023). It must be "[o]f, relating to, or involving material things" or "pertain[] to real, tangible objects." *Physical*, Black's Law Dictionary (11th ed. 2019).

Taking the Policy at face value, then, we conclude that the loss of covered property must be tangible and material. It must be perceptible, a physical alteration or change. *E.g.*, *Oral Surgeons, P.C. v. Cincinnati Ins. Co.*, 2 F.4th 1141, 1144 (8th Cir. 2021) ("[T]here must be some physicality to the loss or damage of property— e.g., a physical alteration, physical contamination, or physical destruction."); *Mudpie, Inc. v. Travelers Cas. Ins. Co. of Am.*, 15 F.4th 885, 891 (9th Cir. 2021) ("[F]or loss to be covered, there must be a distinct, demonstrable, physical alteration of the property.") (internal quotations and citations omitted)). We find persuasive the reasoning that the "presence of the words 'direct' and 'physical' limit the words 'loss' and 'damage' and unambiguously require that the loss be *directly* tied to a material alteration to the property itself, or an intrusion onto the insured property."

*Promotional Headwear Int'l v. Cincinnati Ins. Co.*, 504 F. Supp. 3d 1191, 1202 (D. Kan. 2020) (emphasis added).

Additionally, we view the Policy in light of all of its provisions, which support an interpretation that "direct physical loss" of property must be tangible or material. Throughout the Policy, the interaction between "loss" and "interruption of business" supports the conclusion that in order to have a qualifying "loss," the property must be "repaired, rebuilt, or replaced." The Policy provides that "Income Protection" protects an insured from "loss of 'income' and/or 'rental income'" sustained "due to partial or total 'interruption of business' *resulting directly from 'loss' or damage to property on the premises.*" (emphasis added). Coverage is predicated on a period of interruption that is calculable from "the date of direct 'loss' to covered property caused by a peril insured against; and [ending] on the date when the covered property *should be repaired, rebuilt, or replaced with reasonable speed and similar quality.*" (emphasis added).

Thus, based on the language of the Policy and how "loss" due to an "interruption of business" is calculated to ascertain the period of coverage, some type of physical damage, alteration, change, or decimation is required in order to repair, rebuild, and replace.

## 2. "Loss of Use"

Appellants argue that "loss of use" of their businesses constitutes "direct physical loss," and that the disjunctive "or" in "direct physical loss of or damage" means that "loss" must be differentiated from "damage." But a loss of use, without more, would fail to meet the requirement that the loss be "physical" in nature.

Appellants contend that because "loss" is defined as "direct and accidental loss of or damage," it is unclear what "loss" means; thus, the court should interpret it according to its plain meaning—which could include "loss of use." But both "direct" and "physical" modify "loss" in the Policy. Additionally, the definition of "interruption of business," which requires a degree of physical restoration or replacement of the property, makes clear what constitutes a "loss" warranting Income Protection coverage.

Appellants further highlight that the Income Protection section of the Policy does not define "damage." Appellants ask us to look to the Erie "Commercial General Liability Coverage Form," and apply the definition given to "property damage" therein, which includes "loss of use." The Commercial General Liability

Coverage Form covers "sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." "Property damage" is defined in the "Commercial General Liability Coverage Form" as:

> a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
>
> b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the 'occurrence' that caused it.

At issue here is the Ultrapack Plus Policy, not general liability coverage, which does not include the term "property damage." We are not persuaded that we should impute the special meaning of "property damage" found within the "Commercial General Liability Coverage Form" to the term "damage" used in the Policy without explicit language permitting such extension. Most convincingly, both the Ultrapack Plus Policy and the general liability coverage form specify that "words and phrases that appear in quotation marks have special meaning." Section V contains the special definitions for the "Commercial General Liability Coverage Form," and Sections XI and VIII contain the special definitions for the Policy. Under the "Commercial General Liability Coverage Form," "property damage" has a special meaning, as it appears in quotation marks. But the term "damage" in the

Policy is not contained in quotation marks. Therefore, the Policy does not have an applicable special meaning. Moreover, appellant has not pointed to, and we are unable to find, language in either the "Commercial General Liability Coverage Form" or the Policy, allowing for the extension of specific definitions between the different policy parts.

The government edicts prevented appellants from accessing and using their properties to operate their respective businesses. However, there was no loss that required repairing, rebuilding, or replacement, completion of which would determine when Income Protection coverage would end. Appellants do not allege that the Mayor's orders had any effect on the physical structures or interiors of the properties. Absent any physical change to the property, which requires corrective action of a physical nature, loss of use is not a "direct physical loss" which warrants coverage under the Policy.

Appellants remind us that ambiguous insurance contracts are construed in favor of the insured. Before the trial court, both parties argued that the plain language of the Policy was unambiguous, and normally, our review would be limited to that framing. *Vessels v. District of Columbia*, 531 A.2d 1016, 1019 (D.C. 1987); *Jordan v. United States*, 235 A.3d 808, 828 (D.C. 2020) (Easterly, J., concurring).

Regardless, beyond quoting the axiom about construing ambiguous insurance contracts in favor of the insured, appellants make no real argument that the Policy is ambiguous. Instead, they assert several times, as they did to the trial court, that the Policy's coverage is "unambiguous."

Additionally, contracts are not ambiguous simply because the parties disagree as to how a contract should be construed or interpreted. *Bolton v. Crowley*, 110 A.3d 575, 587 (D.C. 2013) (quoting *Burbridge v. Howard Univ.*, 305 A.2d 245, 247 (D.C. 1973)). There is no ambiguity here. Instead, based on the plain reading of the Policy and a harmonized reading of its provisions, a "direct physical 'loss' of or damage to Covered Property" requires a tangible change or alteration to the property.

### 3.     "All Risk"

Appellants next argue that the Policy is an "all risk" insurance policy that "requires coverage for all business interruption losses unless they are clearly and unambiguously excluded." Appellants assert that because the Policy "insures against direct physical 'loss', except 'loss' as excluded or limited in this policy," in

the absence of a virus or pandemic exclusion, the Policy covers loss of use due to the pandemic.

Coverage of "'all risks' does not mean 'every risk.'" *Port Auth. of N.Y. & N.J.*, 311 F.3d at 234. "The term 'all-risk' has been said to be 'somewhat misleading'" as "'[a]ll-risk' is not synonymous with 'all loss.'" *Intermetal Mexicana, S.A. v. Ins. Co. of N. Am.*, 866 F.2d 71, 75 (3d Cir. 1989). "A loss which does not properly fall within the coverage clause cannot be regarded as covered thereby merely because it is not within any of the specific exceptions . . . ." *Port Auth. of N.Y. & N.J.*, 311 F.3d at 234 (quoting 10 *Couch on Insurance* § 148:48 (3d ed. 1998)); *see also, e.g.*, *Doherty v. Allstate Indem. Co.*, 734 F. App'x 817, 821 (3d Cir. 2018) (explaining that where an all-risk policy covered "sudden and accidental direct physical loss to [the] propert[ies]," damage to a property that was no more than "wear and tear and general lack of maintenance" fell outside of the ambit of the policy). Although the Policy here does not include a specific virus or pandemic exclusion, no other clause extends coverage to loss of use absent a physical impediment to the property. Therefore, even with the Policy being coined an "all-risk" insurance policy, there is no clause covering loss of use as a result of the Mayor's COVID-19 orders.

### 4.     Other Jurisdictions

Finally, we note that we join the majority of other courts in determining that "direct physical loss of or damage to property" requires some sort of tangible, material alteration, which does not include "loss of use." *See In re Erie COVID-19 Bus. Interruption Prot. Ins. Litig.*, 2022 WL 7933018, at \*14-22 (W.D. Pa. Oct. 14, 2022) (collecting cases). "Nearly all courts addressing this issue have held that economic loss unaccompanied by a physical alteration to the property does not trigger coverage under a commercial property insurance policy." *MacMiles, LLC*, 286 A.3d at 335.

Appellants do direct our attention to a few cases where the court found that the policy at issue was ambiguous or susceptible to multiple reasonable interpretations.[19]     Our review must be focused on the language of the specific

---

[19] *E.g.*, *Elegant Massage, LLC*, 506 F. Supp. 3d at 373 (policy was ambiguous where "direct physical loss" was "subject to a spectrum of interpretations in Virginia on a case-by-case basis"); *Snoqualmie Ent. Auth.*, 2021 WL 4098938, at \*4 (one reasonable interpretation of the undefined phrase "all risks of physical loss or damage" is the risk that an insured is "deprived of the ability to physically use" property); *In re Soc'y Ins. Co. COVID-19 Bus. Interruption Prot. Ins. Litig.*, 521 F. Supp. 3d at 742 (endorsing the theory that "loss of use" could constitute "physical loss" and thus, a reasonable jury could find that the insured suffered a "direct physical loss"); *see also Regents of the Univ. of Colo. v. Factory Mut. Ins. Co.*, 2022 Colo. Dist. LEXIS 1, \*8 (D. Colo. January 26, 2022) (explaining that when "the

contract at issue and the language it uses. *See Young*, 39 A.3d at 40. Here, the Policy is unambiguous. Additionally, we note that other courts have examined the same Erie Ultrapack Plus Policy and have concluded that mandated business closures due to COVID-19, without more, did not cause the requisite "loss" under the Policy. *See In re Erie COVID-19 Bus. Interruption Prot. Ins. Litig.*, 2022 WL 7933018, at *34.

In other cases, the court found that allegations that COVID-19 was actually present on the premises were sufficient to survive the motion-to-dismiss stage.[20] But a claim under this type of "contamination theory" requires "express[] aver[ment]" that COVID-19 was present. *SWB Yankees, LLC*, 2021 WL 3468995, at *19. Appellants did not argue this type of contamination theory to the trial court.[21]

---

phrase 'physical loss or damage' is not preceded by the modifier 'direct,'" then an interpretation that "physical loss" can include "inability to maintain a presence on the property," with no requirement of structural alteration, is more reasonable).

[20] *E.g.*, *Blue Springs Dental Care, LLC v. Owners Ins. Co.*, 488 F. Supp. 3d 867, 877 (W.D. Mo. 2020); *Dino Palmieri Salons, Inc. v. State Auto. Mut. Ins. Co.*, 2020 WL 7258114, at *5 (Ohio C.P. Nov. 17, 2020).

[21] Additionally, without further argument and consideration, we could not say that the allegation of active presence of COVID-19 in a business constitutes "direct physical loss or damage." *See, e.g.*, *W. Fire Ins. Co.*, 437 P.2d at 39 (there was "physical loss" where the "accumulation of gasoline . . . so infiltrated and saturated" a premises as to make it "uninhabitable"); *Port Auth. of N.Y. & N.J.*, 311 F.3d at 236 (presence of asbestos was not "physical loss or damage" unless it was present in such quantities so as to make the building "uninhabitable").

We sympathize with appellants for the losses they experienced and may continue to experience due to the COVID-19 pandemic. But we must construe the Policy as written. Mayor Bowser's orders limiting appellants' use of their properties did not occasion direct physical loss of property that entitles appellants to coverage under the Policy.

## III.   Conclusion

We affirm the trial court's grant of Erie's cross-motion for summary judgment. Based on our full review of the Policy, "direct physical loss" requires a tangible change or alteration to the properties—which does not include a loss of use. Appellants have not alleged a tangible change or alteration to their properties, and thus, they have not shown "physical loss of or damage to Covered Property" as required by the Policy.

*So ordered.*